AULL *v.* PETERSON.

1. CANCELLATION OF INSTRUMENTS—CONTRACTS—INSANE PERSONS —COMPETENCY.

In proceedings in the court of equity by the guardians of a man over 75 years of age, suffering with *senile dementia,* to set aside a contract made by him with defendants for his board and lodging for the rest of his natural life, on the ground of his mental incompetency at the time the contract was made, evidence examined, and *held,* sufficient to sustain the finding of mental incompetency.

2. EQUITY—INCOMPETENT PERSONS—BOARD AND KEEP—AMOUNT OF COMPENSATION.

An allowance of $12 per week for the board and lodging of an incompetent person, and $68 for other services rendered him during a period of 68 weeks, under conditions which were somewhat trying because of his mental condition and filthy habits, *held,* not excessive.

Appeal from Allegan; Cross, J. Submitted October 19, 1917. (Docket No. 17.) Decided March 27, 1918.

Bill by Adolphus Aull and another, guardians of Henry Aull, an incompetent, against Mary E. Peterson and another for the cancellation of a contract and. for an accounting. From the decree rendered, both parties appeal. Affirmed.

*Clare E. Hoffman,* for plaintiffs.
*Smedley & Linsey,* for defendants.

BIRD, J. The bill in this case was filed to cancel the following contract:

"FENNVILLE, MICHIGAN, December 15, 1913.
"I, the first party, Henry Aull does agree to turn over notes to the second party, Mrs. M. E. Peterson, amount twenty-one hundred and nineteen dollars, and pension of $20.00 per month and what arise I get. With six thousand dollars at my death

"I, the second party, Mrs. M. E. Peterson does agree to give the first party, Henry Aull, board and lodging and good care the natural life time of the first party, Henry Aull.

"I, the first party, Henry Aull, does agree to turn over notes of twenty-one hundred and nineteen dollars at the time first and second party signs this contract.

"I, the first and second party, Henry Aull and Mrs. M. E. Peterson, does agree this shall be deposited in the Old State Bank of Fennville or at Fruit Growers Bank at Saugatuck. I, the first and second party, Henry Aull and Mrs. M. E. Peterson, does agree that this contract is a permanent agreement between first and second party, Henry Aull and Mrs. M. E. Peterson.

"HENRY AULL,
"MRS. M. E. PETERSON.

"Witnesses:
"CHESTER T. PETERSON,
"MRS. LENA PETERSON."

Henry Aull at the time this contract was made was a bachelor, 75 years of age. He was a farmer in his early life and was an old time resident of Allegan county, and had, by careful management of his business affairs, accumulated a fortune estimated at $50,000. For at least 20 years he had been retired from active farming and had boarded with a Mrs. McCormick at Fennville, a neighbor of defendants. At about the time the contract was made, for some reason it became inconvenient for him to remain longer at Mrs. McCormick's and he applied to Mrs. Peterson to provide a home for him. Mrs. Peterson permitted him to come to her home, and on the following day this contract was made. He remained there for a period of 68 weeks, when he left and returned to the home of Mrs. McCormick. His brother, Adolphus, learning of his mental condition, came to see him and took him to his home in St. Clair county, in the State of Illinois, where he was adjudged incompetent by the

proper authorities, and Adolphus and Jacob, brother and nephew, were appointed guardians of his person and estate. It is their claim in the bill that Henry was mentally incompetent at the time he entered into this contract. After a somewhat extended hearing the chancellor found that Henry Aull was mentally incompetent at the date of the contract, and made a decree canceling it, and awarding Mrs. Peterson $12 a week for board and care during the 68 weeks he remained with her. He awarded defendant Chester Peterson, a son of Mary, for services in shaving Henry and in driving him around the country, the sum of $68, and decreed that defendants should return to plaintiffs the sum of $1,837.37. From this decree both parties have appealed.

Plaintiffs assert that the chancellor was wrong in awarding Mrs. Peterson $12 per week for the care of Mr. Aull, inasmuch as the proofs show that he was boarded and cared for at Mrs. McCormick's prior to his going to Mrs. Peterson's for $3.50 a week, and after he returned for $4 a week; that the award of $68 made to Chester Peterson was too large for the services which he performed, and that the testimony in that regard does not support the finding.

Defendants claim that the decree is wrong because it determines that Henry Aull was mentally incompetent at the time the contract was made.

Several physicians were sworn and testified that Henry Aull was afflicted with *senile dementia* and was at that time in a well advanced stage. They testified that *senile dementia* was a progressive disease due to old age, and that the progress of the disease depended upon the condition of the particular patient. Testimony was given by them to the effect that when questioned by them he could not recall his surname. Did not know how old he was; could not tell where his home was, and did not appear to know that he

had any business interests; could not tell whether he was in Chicago or Kalamazoo, and could not tell who was President of the United States. One physician testified that when he was brought to his office in Chicago for examination he tried to make love to a nurse in his employ and that later when his wife came in he attempted to make love to her. The physicians gave it as their opinion that he was not mentally competent to transact business in December, 1913, at the date of the contract, although the examinations were made some time subsequent to that date.

It was shown by the testimony of the defendant Mary Peterson, that while he was at her house he refused to bathe, that he did not take a bath during all the time he was there; that he would lie upon the floor and break wind in the presence of the family; that he would not attend the calls of nature, and as a consequence his clothing became filthy and offensive, due to being saturated with urine; that he was affected with catarrh and would sit at the table and permit the mucus from his nose to fall onto his plate and food without making any effort to prevent it.

As is usual in such cases many neighbors, business acquaintances and friends were sworn, and nearly all of them had observed more or less change in Mr. Aull since 1911 or 1912, but they were divided in opinion as to whether he was mentally competent to transact business and protect himself at the time the contract was made. The testimony shows that after this change came over him he was unsteady of gait, looked feeble and was rambling in his conversation, and that it worked a complete change in his habits of life. That instead of being a prudent business man he became careless and loaned money without security. Instead of being clean and tidy he took no care of his person, and refused to bathe. Instead of having good table manners he ate with his hands and crowded the

food into his mouth, and indulged in other disgusting habits which were offensive. Instead of being a spare eater he became a ravenous one. Instead of continuing his lifelong aversion for women he wanted to caress and make love to nearly every woman he met. The doctors explained that his unsteady gait and this reversal of habits was quite characteristic of the disease from which he was suffering.

The testimony taken in its entirety is very convincing that Henry Aull's mind was very much impaired at the time he entered into the agreement and it is probable that no one knew this better than Mrs. Peterson, because she knew him and could compare him in his then mental condition with his former self. Notwithstanding this knowledge she manifested a disposition to take advantage of his weakness by demanding not only compensation but a bonus, at the same time giving him no assurance or security that the contract would be carried out in the event of her illness or death. The following excerpts from her own testimony will indicate the state of her mind while dealing with him:

"*Q.* He was not very contrary about making a contract with you, was he?

"*A.* It was his own doings, I did not want him to make any contract. I did not ask for anything. I told him I would not take him to keep him his lifetime unless he would make it an object for me to take him. He had to raise the pile enough so that it became an object to me, and that is what he did do.

\* \* \*

"*Q.* How was he in his conduct with you, did he try to get familiar with you?

"*A.* No, he did not get familiar, to make love, he asked me to marry him, that was all. He asked me to marry him, I think it was in the fall that he went away in the spring. He went away in the spring and I told him if I should marry him he would have to give me a certain amount for my own share, and he proposed to say—he said he would not do it, and

so I said all right. Then he wanted to let it stand until spring, then in the spring he said he guessed he would let it drop, and I thought so too."

Upon the whole record we are persuaded that the chancellor reached the right conclusion on the question of mental competency. We also agree with him that $12 per week for Mr. Aull's board and care is not too much if the conditions existed which Mrs. Peterson and others detailed. Neither are we prepared to say that $68 allowed to Chester for services which he rendered Mr. Aull is excessive. The conditions under which some of the services were performed were somewhat trying and we think this allowance should not be disturbed.

We think the decree a very just solution of the whole matter and it will be affirmed. No costs will be allowed either party.

OSTRANDER, C. J., and MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.